FILED
04/29/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 6, 2018

IN RE LAURA F.

**Appeal from the Juvenile Court for Overton County**
**No. 16-JV-59        Diana F. Monroe, Judge**

_____

**No. M2017-01767-COA-R3-PT**

_____

A mother appeals the termination of her parental rights to her child. The juvenile court found by clear and convincing evidence three statutory grounds for termination of parental rights: abandonment by willful failure to support and by willful failure to visit and persistence of conditions. The court also found by clear and convincing evidence that termination of mother's parental rights was in the child's best interest. Upon our review of the record, we affirm.

**Tenn. R. App. P. 3; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Kayla Collins Cantrell, Gainesboro, Tennessee, for the appellant, Rebecca F.

John M. Meadows III, Livingston, Tennessee, for the appellee, Velma B.

**OPINION**

**I.**

**A.**

In early April 2012, Rebecca F. ("Mother") took two computer disks to the Livingston Police Department belonging to her husband, Sean F. ("Father"). The disks contained child pornography. This was not the first time Mother had found child pornography in the home.

A few days later, Father appeared at the Overton County Sheriff's Office with one of the couple's children, Laura, who was less than one year old. Father explained that he had left his home and taken the baby and that he did not know Mother's whereabouts. Father requested assistance getting his daughter in the Tennessee Women, Infants, and Children (WIC) Program. Father's visit prompted the sheriff's office to contact the Tennessee Department of Children's Services ("DCS").

When the DCS case manager arrived, she asked Father to consent to a drug screen. Father obliged, offering that he would test positive for marijuana. In fact, the drug screen was positive for marijuana, opiates, and oxycodone. Father had in his possession a prescription pill bottle that had been filled just two days prior with 24 hydrocodone tablets. Only eight remained. Father admitted to taking four tablets at 3:00 a.m. that morning and another three tablets before driving to the sheriff's office with his daughter. Father's prescription was for a half tablet, twice a day. A sergeant with the sheriff's office arrested Father.

Later that day, the case manager interviewed Mother at the DCS office. Mother related that Father had left their home with the baby four nights prior during an argument and that she had not seen them since. Mother claimed that Father had been physically as well as verbally abusive toward her.

DCS permitted Mother to take Laura home with her. But the following day, the case manager received a call from a detective with the Livingston Police Department. The detective had confirmed that the disks turned over by Mother contained child pornography; the detective characterized the content as some of the worst he had seen in all his years in law enforcement.

This information prompted DCS to again interview Mother. Mother said she had discovered child pornography when she first moved in with Father and that she had destroyed it. When Mother confronted Father about the discovery, Father allegedly told Mother that she could get rid of it, and Father claimed that he would not do it again. Mother had discovered the disks approximately two months prior to turning them in to the police. When she put the disks into a computer, Mother knew they contained child pornography. Still, Mother admitted that she had been leaving the baby in Father's care while Mother was at work.

DCS decided to remove Laura from Mother's custody while the child pornography allegations were investigated further. DCS placed Laura with Velma B. ("Foster Parent"), who had been Mother's foster parent. Foster Parent had also adopted Mother's sister.

On April 10, 2012, in the Juvenile Court for Overton County, Tennessee, DCS filed a petition to declare the child dependent and neglected. Ultimately, the juvenile court found Laura to be dependent and neglected and awarded temporary custody to Foster Parent as a kinship placement, rather than a foster placement, based on Foster Parent's relationship to Mother. The court granted the parents only limited, supervised visitation. Before the parents could petition to change visitation or custody, the court required Mother to complete counseling and parenting classes and Father to complete an intensive outpatient program and a psychosexual evaluation.

Nearly three and a half years after the juvenile court found Laura to be dependent and neglected, Mother filed a "Petition for Custody to be Restored to Parent." The petition sought custody of Laura and another child Mother shared with Father that had been born just over a year after Laura's removal.[1] In the petition, Mother alleged "that since having her children removed from her custody, she has turned her life around and is able to provide her children a safe and suitable home."

Foster Parent opposed Mother's petition. In a counter-petition, Foster Parent requested that she be awarded permanent guardianship of Laura. Later, Foster Parent amended her counter-petition to seek termination of Mother's and Father's parental rights to Laura.

B.

Foster Parent's amended counter-petition asserted the same grounds for terminating both Mother's and Father's parental rights. The amended counter-petition alleged abandonment by willful failure to visit; abandonment by willful failure to support; persistence of conditions; and failure to manifest an ability and willingness to assume custody or financial responsibility for the child.

On July 19, 2017, the counter-petition to terminate came on for trial along with Mother's petition for custody. Mother, Foster Parent, Mother's sister, and a friend of Foster Parent testified.

Mother testified first. At the onset, it was clear that Mother's circumstances had changed significantly since she filed her petition for custody. When her petition was filed, Mother was employed, working two jobs, and living in a rented four-bedroom, two and one-half bath home. She had recently given birth to her fourth child. By the time of trial, Mother was unemployed, receiving government assistance, and living in a shelter for domestic violence victims. And DCS was involved with Mother's fourth child based on allegations of drug use by Mother. Mother was in the process of resuming alcohol and drug addiction classes.

---

[1] Later, Mother and Father would surrender their parental rights to Laura's younger sibling.

3

Mother last visited with Laura on Mother's Day, roughly two months prior to the trial. According to Mother, the visit took place at church and that she "went straight from church to [Foster Parent's] house, to visit a little bit longer with [Laura]." Mother gave various reasons for why she was not following the supervised visitation schedule ordered by the court as part of the dependency and neglect proceedings. Mother claimed that "[e]very time that the people who was [sic] supervising went and tried to get my daughter from [Foster Parent], [Foster Parent] refused to let them see [Laura] – or let her – her get them [sic]." Later, Mother testified that she could not visit more frequently because she did not have a vehicle. Mother also claimed that, when she called Foster Parent and asked to visit, Foster Parent would tell her "no" because Foster Parent had "plans, that there's things that they have to do." Mother stated that she could "pop in" on Foster Parent to see Laura. She also could see her child at the church that both Foster Parent and Mother attended.

Mother acknowledged that she had paid no child support since May 13, 2016. Her employers withheld child support payments from her paychecks and that was what led Mother to quit her jobs. She explained that, after the child support payments were taken out of her checks, she barely had $100 on which to live. Mother contended that she got more money through government assistance than working. But Mother was looking for a job.

When asked about the circumstances surrounding the removal of Laura in April 2012, Mother maintained that the child was removed from Father's custody and not her custody. Although acknowledging that she was named as a respondent in the dependency and neglect petition, Mother understood that was only because she was married to Father. Mother claimed that DCS "had no issues with me keeping Laura." According to Mother, "[i]t was the fact that I was still married to [Father], and that [the DCS investigator] had a fear that I would go back to him, which, I did."

Mother agreed that Father was both verbally and physically abusive towards her. Father hit Mother. Mother also described an incident in 2012 or 2013 in which Father attempted to run Mother over with a car in which her children were passengers. Mother also acknowledged Father's drug use.

Despite these issues and Father's possession of child pornography, Mother admitted that she kept "going back to" Father. She explained that it was "stupidity" on her part. Still, Mother would not rule out permitting Father to see Laura. After faulting Foster Parent for not permitting Father to have visitation with the child, Mother said:

> It doesn't matter about the decisions he has made. The child, when she gets older, should have her own rights to make out if he is worthy enough person to be around. You should not – as a person who is watching a child,

4

should not take the judgment on that fact of saying, okay, well, you're not going to be around them, even if he wasn't on drugs. Because there was quite a few times he was not doing anything, and [Foster Parent] has despised him from the day I married him.

Mother had a total of three children with Father, Laura being the oldest. Father's parents adopted the couple's second child, after Mother and Father voluntarily surrendered their parental rights. Mother also surrendered her parental rights to her third child, who had also been adopted. Mother's fourth child was by another man.

Foster Parent testified next. She had been involved in the foster care system since 1997. She foster parented both Mother and her sister ("Sister"). Foster Parent adopted Sister. Foster Parent cared for Mother from the age of 10 until Mother aged out of the foster care system.

Although Foster Parent did not adopt Mother, their relationship appeared to have been warm, at least at one point. In her testimony, Mother referred to Foster Parent as "grandma." And when asked about Laura's placement with Foster Parent, Mother described Foster Parent as "the next person I had closest to me that I trusted at that time."

By the time of trial, Foster Parent had been caring for Laura for over five years. Foster Parent testified that she cared for Laura some in 2011 but that she had Laura continuously since her removal from Mother and Father. Foster Parent likened her relationship to Laura to that of "a grandma and a child."

Foster Parent denied that she had prevented Mother from visiting the child. She explained that she declined to let Mother take the child if there was not a safe environment for them to go. According to Foster Parent, Mother often missed her scheduled visitation and did not call. On one occasion Mother arranged with Foster Parent to meet at McDonald's. Foster Parent arrived with Laura, but Mother never showed.

Foster Parent stated that Mother "didn't visit very much at all." Foster Parent never knew when Mother would visit and that sometimes Mother would "pop in." When Mother did visit, Foster Parent portrayed Mother as more interested in her surroundings than in Laura. Mother would arrive to visit and would eat at Foster Parent's house. Foster Parent would then have to take Mother home because Mother did not have a car.

Foster Parent last received child support from Mother in September 2016, when Mother paid $18. Prior to that, Foster Parent last received a child support payment on May 13, 2016. Foster Parent stated that Mother never paid the full monthly amount due for child support.

Foster Parent felt it would be devastating to Laura if she were removed from her care. Laura, who was preparing to start the first grade, was close to the children of Foster Parent's son and also had many friends in the neighborhood.

Foster Parent desired to adopt Laura if Mother's and Father's parental rights were terminated. In explaining why termination was in the child's best interest, Foster Parent expressed her concern about the impact of the men in Mother's life on the child.

> I think [Laura has] not got a chance with [Mother], because [Mother] is not going to leave the men alone. And she's not going to leave [Father] alone. As long as he's living, she's not going to leave him alone. And I think for [Laura's] education, for her love, for her security, for her safety in every way, she would be better off with me.

In sum, Foster Parent had seen no change in Mother. But she also stated that Mother was welcome in her home as long as Father was not with her. If Mother "gets her act together" in a couple of years, Foster Parent would consider permitting Mother to visit Laura.

Sister described Foster Parent as a wonderful parent, both loving and caring. Sister also felt it would be very detrimental for Laura to be removed from Foster Parent's care. Sister did not consider Mother to be a responsible person. She estimated that Mother had only seen Laura between 25 and 30 times since Foster Parent had been awarded custody.

C.R. was a foster parent and had been friends with Foster Parent for twenty years. He also testified that Mother was "like a daughter" to him. C.R. and his wife had cared for Mother's second child for six months while Mother was "going through problems with her husband." He was happy to help out so Mother could get Father out of her life. C.R. characterized Foster Parent as "a good grandmother" to Laura. He also agreed that they had a strong bond with each other.

The juvenile court terminated both Mother's and Father's parental rights.[2] As to Mother, the court concluded that there was clear and convincing evidence of three statutory grounds for termination. First, the court found that Mother had abandoned her child by willful failure to visit. The court characterized the visits Mother made during the four month period preceding the petition to terminate as token. Secondly, the court found that Mother abandoned her child by willful failure to support. Thirdly, the court found that the child had been removed from Mother's care for more than six months and that the conditions that led to her removal persisted. In the court's view, there was little likelihood that those conditions would be remedied so that the child could be returned to

---

[2] Father did not appeal the termination of his parental rights.

6

Mother in the new future and the continuation of the parent/child relationship greatly diminished that chance of the child's integration into a safe, stable, and permanent home. Finally, after examining the applicable statutory factors, the court found that termination of Mother's parental rights was in the child's best interest.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Statute identifies those circumstances in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* at 596. "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, Mother contends that Foster Parent failed to prove any of the statutory grounds for termination by clear and convincing evidence. Mother also contends that termination of her parental rights was not in Laura's best interest and that the evidence preponderates against some of the juvenile court's factual findings.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is

7

otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A. GROUNDS FOR TERMINATION

### 1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The parental termination statutes provide alternative definitions for "abandonment." *Id*. § 36-1-102(1)(A) (2017). Among other things, "abandonment" includes "the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights."[3] *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, because the counter-petition was filed on February 1, 2017, the relevant four-month period is September 1, 2016, to January 31, 2017, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

To terminate parental rights on the ground of abandonment, the court must find the abandonment to be willful. While the failure to visit or support presents a fact question, whether that failure is willful presents a question of law. *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). A "[f]ailure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

### a. Willful Failure to Visit

The juvenile court found that, during the four months preceding the petition to terminate, Mother had "engaged in only token visitation with the child as her minimal visits were nothing more than perfunctory visitation, or visitation of such an infrequent

---

[3] Effective July 1, 2018, petitioners no longer have to prove a parent's failure to support or to visit was willful. 2018-2 Tenn. Code Ann. Adv. Legis. Serv. 174 (LexisNexis). Under the current version of the statute, the parent or guardian must raise, and bears the burden of proof on, the defense of "absence of willfulness." Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2018).

nature, or of such short duration, as to merely establish minimal or insubstantial contact with the child." Mother argues that she visited Laura several times and that Foster Parent denied Mother visitation on several occasions.

Our supreme court has stated that "a parent who attempt[s] to visit and maintain relations with his child, but [i]s thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. Although Mother claimed that Foster Parent would not allow her to visit Laura, Foster Parent testified that she did not allow Mother to take Laura to another location for visitation when Mother did not have a safe place to take her. Otherwise, Mother could visit Laura in Foster Parent's home.

By statute, token visitation is visitation that, under the circumstances of the particular case, "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child . . . ." Tenn. Code Ann. § 36-1-102(1)(C). Foster Parent testified that Mother visited with Laura "[m]aybe five times" in the four months leading up to the termination petition. When Mother did visit, she was distracted and did not pay much attention to Laura. Despite the court ordering 24 hours of supervised visitation every weekend, Mother's own testimony indicated that her visits were far shorter than that, at best less than three hours. Foster Parent also testified that Mother often missed her scheduled visits with Laura.

Based on this record, we conclude that the evidence was clear and convincing that Mother abandoned her child by willful failure to visit during the four months preceding the filing of the petition. Although Mother, after first testifying she could not recall, guessed that she may have visited between 6 and 10 times during the applicable time period, the court did not credit Mother's testimony. And we will not second guess the court's credibility determination. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case."). We agree with the assessment that Mother engaged in only token visitation under the circumstances of this case.

b. Willful Failure to Support

The juvenile court also found that Mother had abandoned Laura by failure to support despite being "aware of her duty to support" and having "the capacity to do so in that she was able to work." Mother argues that she made consistent payments while she was employed, and "[i]t was only when her job ended that she stopped making consistent payments." She also argues that the birth of her fourth child in March 2016 prevented her from working for a while.

9

A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). In making a willfulness determination, the court must review a parent's means, which includes both her income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

We have found that a failure to pay support during a period of unemployment was willful. For instance, when a parent is able to work but not "actively pursuing steady work or any other source of legal income" during the period of unemployment, the failure to pay support can be willful. *See, e.g.*, *In re Jacob A.G.*, No. E2012-01213-COA-R3-PT, 2013 WL 357573, at *5-6 (Tenn. Ct. App. Jan. 30, 2013) (finding willfulness where parent had not worked while her children were in state custody and the only evidence that parent sought employment was "her testimony that she submitted applications at 'all the different places around town'").

Without dispute, Mother only paid $18 in support during the four months preceding the filing of the counter-petition to terminate. Mother was unemployed during that same time period. Mother explained that she quit both of her jobs voluntarily in May 2016 because "child support was taking every bit of [her] money." She claimed to be "barely making enough for gas to go to work." From November 2016 to March 2017, which overlaps the four months preceding the filing of the counter-petition, Mother stated she was living with Father because she wanted to be a stay-at-home mom to her youngest child. But Sister testified that Mother confided in her that she did not want to work because she did not want to pay child support.

Based on this record, we conclude that the evidence was clear and convincing that Mother abandoned her child by willful failure to support during the four months preceding the filing of the counter-petition. Willful unemployment can equate to a willful failure to support. *See In re Austin D.*, No. E2012-00579-COA-R3-PT, 2013 WL 357605, at *11-12 (Tenn. Ct. App. Jan. 30, 2013) (the mother's personal choice not to work contributed to the conclusion that she willfully failed to pay child support). She voluntarily quit both her jobs and did nothing to find a new job to pay child support. Although she had an available mechanism to reduce her support obligation based on her income, Mother did not pursue that option. The evidence also showed that both Foster Parent and C.R. were sources of financial support for Mother.

2. Persistence of Conditions

Finally, the juvenile court found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The

goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). So the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. When the termination petition was filed, the ground applied as a basis to terminate parental rights when:

> The child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[4] Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

This record contains clear and convincing evidence that the conditions preventing Laura's safe return to Mother persisted. Laura was removed because of Father's involvement with child pornography and use of drugs. Although Foster Parent gave her money for a divorce, Mother remained married to Father. When Mother left Father, she became pregnant with another man's baby, a man Mother also accused of physical abuse. Later, Mother returned to live with Father so she could be a stay-at-home mother for the new baby. In addition, Mother acknowledged that she used methamphetamine while she was living with Father in November or December 2016.

We further conclude that the evidence was clear and convincing that there was little likelihood that these conditions would be remedied in the near future. Mother was still struggling to get back on her feet after leaving Father. Mother had no job and was

---

[4] In 2018, the Legislature made significant changes to the persistence of conditions ground for termination. 2018-2 Tenn. Code Ann. Adv. Legis. Serv. 175-76 (LexisNexis).

living in a shelter for domestic violence victims. And DCS was involved with the only child still in Mother's custody.

We also have little difficulty in concluding that continuation of the parent and child relationship greatly diminishes Laura's chances of early integration into a safe, stable, and permanent home. Mother filed her petition for return of custody over four years after Laura's removal. And, at the time of the trial, Foster Parent had cared for Laura for over five years. Foster Parent provided a safe and stable home. Mother, on the other hand, could offer neither.

## B. BEST INTEREST OF THE CHILD

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts may consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering all the statutory factors, the juvenile court determined that termination of parental rights was in Laura's best interest. The court emphasized Mother's lack of adjustment in circumstances, her inconsistent visitation, Laura's strong bond with Foster Parent, and Mother's failure to pay child support. Mother challenges the court's finding that she failed to make changes in her life. She argues she has "made significant changes and has the capability to make even more positive changes in her life."

12

The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The evidence simply does not support Mother's claim that she made significant changes in her life. Mother was living in a domestic violence shelter with her new baby. After Laura was removed from her custody, Mother continued her relationship with Father and had two additional children with him. After leaving him, she began a relationship with another abusive man and had a child with him. Mother then returned to live with Father. She also admitted to using methamphetamine with Father in the past year.

The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). In five years, Mother failed to make an appreciable change. DCS did offer Mother services. In addition, Foster Parent attempted to help Mother by letting her live in a mobile home on her property while Father was to get treatment, giving her money to obtain a divorce from Father, and giving her a car. This factor also favors termination.

Under the third factor, we consider whether Mother visited Laura regularly. *See id.* § 36-1-113(i)(3). The evidence does not preponderate against the court's finding that Mother's visitation was, at best, inconsistent. Foster Parent testified Mother visited about five times in the four month period preceding the filing of the termination petition. When asked how many visits she made during the year leading up to the trial, Mother estimated that she had only visited "5 to 10 times" and that those were "just pop-in visits."

The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). Foster Parent and Sister both testified that Mother did not have a meaningful relationship with Laura. The court found that "[a]lthough Laura interacts with [Mother] and refers to [Mother] as momma, they barely know each other." The evidence does not preponderate against this finding.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The evidence does not preponderate against the court's finding that this factor favors termination. Laura has lived with Foster Parent for five years. The child was not even a year old when she was placed with Foster Parent. Foster Parent is the only parental figure that the child has known. Both Foster Parent and Sister testified to the adverse impact of returning the child to Mother.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). The evidence supports the finding that Father possessed child pornography and that Mother "voluntarily maintained relationships with two abusive men." But, by the time of trial, Mother no longer lived with either man.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [the intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). The court found that "[Mother] has maintained abusive relationships, has used drugs as recently as November or December 2016, is not employed and is homeless." We agree that the proof showed that Mother was unable to be a safe and stable caregiver.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). Mother, according to her own testimony, has been involved in two abusive relationships. She has continued a relationship with Father even after losing or giving up custody of all three of her children with Father. And while Mother appears to have finally ended her relationship with Father and was "looking . . . into getting a divorce," Mother seems amenable to allowing Father to remain in Laura's life.

The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). Mother's record of support also weighs in favor of terminating parent rights.

Here, Foster Parent proved by clear and convincing evidence that termination of Mother's parental rights was in Laura's best interest. Mother contends that staying in Foster Parent's home is not in the child's best interest. She points to Foster Parent's age, 74, and the fact that the relationship between Laura and Foster Parent is akin to that of a grandchild and a grandparent. Although those facts bear on the child's best interest, they do not overcome the combined weight of the other proven facts.

### III.

The record contains clear and convincing evidence to support terminating Mother's parental rights on each of three grounds relied on by the juvenile court. The record also contains clear and convincing evidence that termination is in the child's best interest. Thus, we affirm the judgment terminating Mother's parental rights.

14

_____
W. NEAL MCBRAYER, JUDGE